IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DE'ON L. CRANE, Individually and as the Administrator of the Estate of TAVIS M. CRANE and on BEHALF OF THE STATUTORY BENEFICIARIES, G.C., T.C., G.M., Z.C. and A.C., the surviving children of Tavis M. Crane, ALPHONSE HOSTON,  DWIGHT JEFFERSON, VALENCIA S. JOHNSON, and Z.C., individually, by and through her guardian, ZAKIYA SPENCE, | § § § § § § § § § § § | |
| Plaintiffs, | § § § | CIVIL ACTION NO. 4:19-CV-91 |
| v. | § § | JURY TRIAL DEMANDED |
| THE CITY OF ARLINGTON, TEXAS, AND CRAIG ROPER , | § § § § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

COMES NOW, Plaintiffs, De'On L. Crane, qualified, and acting as the Administrator of the Estate of Tavis M. Crane, deceased, and on behalf of the statutory beneficiaries, G.C., T.C., G.M., Z.C. and A.C., the surviving children of Tavis M. Crane, De'On L. Crane,  Alphonse Hoston, Dwight Jefferson, Valencia S. Johnson and  Z.C., by and through her guardian Zakiya Spence, complaining of Defendants, The City of Arlington, Texas, more particularly The Arlington Police Department ("APD") and Officer Craig Roper ("Roper"), individually and in his official capacity as an Arlington police officer, and for cause would show the Honorable Court as follow:

## I.

1.     The statutory beneficiaries of decedent are entitled to bring an action on account of the ***wrongful death*** of decedent, but they have not commenced the action within ***three months*** of decedent's ***death*** and have not requested that plaintiff not commence such an action. Therefore, plaintiff De'On L. Crane brings this action pursuant to *Section 71.004 of the Civil Practice and Remedies Code* of Texas on behalf of herself and the following beneficiaries: G.C., T.C., G.M., Z.C. and A.C., the surviving children of Tavis M. Crane.

## II.
## NATURE OF THE ACTION

2.     This is an action brought by the Plaintiffs against the City of Arlington, Texas and Officer Roper for his use of excessive and deadly force resulting in the unjustified death of Tavis M. Crane ("Crane") under the color of law in violation of his individual rights under the Fourth Amendment of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983.  Furthermore, Plaintiff De'On L. Crane is entitled to recover as administrator for the Estate of Tavis M. Crane for the decedent's wrongful death as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

3.     Plaintiffs allege that the City of Arlington, Texas (the "City") and its policy makers, specifically Mayor Jeff Williams ("Williams"), the Arlington City Council (the "City Council"), Chief of Police Will Johnson ("Johnson"), and City Manager Trey Yelverton ("Yelverton"), who acts as the chief executive officer for the City (collectively referred herein as the "Policymakers") failed to properly supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of deadly force, including those officers repeatedly accused of such acts.  The Policymakers, specifically Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton had a duty, but failed to implement and/or enforce policies, practices and procedures for the Arlington

Police Department that respected Tavis M. Crane's constitutional rights to assistance and protection under the law. This duty was delegated to the Arlington City Council who hired Mayor Williams to carry out the actions and policies of the council by overseeing the day-to-day operation of the City of Arlington. Defendant the City of Arlington and its Policymakers, specifically Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton's failure to implement the necessary policies and the implementation of unconstitutional policies caused Tavis M. Crane unwarranted and excruciating physical and mental anguish and death. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for their damages and the wrongful death of Tavis M. Crane.

## II.    PARTIES

4.      Plaintiff, De'On L. Crane, the biological mother of Tavis M. Crane, is a citizen of the United States and a resident of Arlington, Texas. De'On L. Crane is qualified, and acting as the Administrator of the Estate of Tavis M. Crane and on behalf of the statutory beneficiaries, G.C., T.C., G.M., Z.C. and A.C., the surviving children of Tavis M. Crane.

5.      Plaintiff, Alphonse Hoston, the biological father of Tavis M. Crane, is a citizen of the United States and a resident of Arlington, Texas.

6.      Plaintiff, Dwight Jefferson, is a citizen of the United States and a resident of Arlington, Texas.

7.      Plaintiff, Valencia S. Johnson, is a citizen of the United States and a resident of Arlington, Texas.

8.      Plaintiff, Z.C., by and through her guardian Zakiya Spence, is a citizen of the United States and a resident of Arlington, Texas.

9.     Defendant, the City of Arlington is a municipality located in Arlington, Texas. The City funds and operates the APD, and Mayor Williams, as the mayor, serves as the City's chief administrator. The Mayor is responsible for carrying out the actions and policies of the council by overseeing the day-to-day operation of the organization.  Mayor Williams along with Johnson were responsible for the implementation of the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The APD is also responsible for preventive, investigative, enforcement services and assuring safety for all citizens of The City of Arlington.  The City may be served by delivering a copy of the complaint to the Mayor, City Manager, Clerk, and Secretary for the City at Arlington City Hall, 101 W. Abram St., Arlington, Texas 76010.

10.     Defendant Craig Roper, upon information and belief, is a resident of Arlington, Texas.  Roper may be served at the Arlington Police Department at 2001 New York Ave., Arlington, TX 76010 or wherever he may be found.

### III.     JURISDICTION AND VENUE

11.     Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities guaranteed to Dwight Jefferson, Valencia S. Johnson, Z.C. and decedent, Tavis M. Crane, by constitutional and statutory provisions.

12.     Venue is proper in this court because the causes of action occurred within the Northern District of Texas, Fort Worth Division.

## IV.   FACTS

13.    On or about February 1,  2017, Crane,  Dwight Jefferson ("Jefferson"), Valencia

S. Johnson ("Johnson") and Crane's two year old daughter, Z.C., were traveling together in

Crane's white 2005 Ford Crown Victoria, within the city limits of Arlington, Texas, to take

Jefferson home.  While stopped at a traffic light, Crane's minor daughter accidently dropped a

candy cane package out of the passenger side window.  At no time prior to that time had Crane

violated any provisions of the Texas Transportation Code that would justify a legal traffic stop

by Arlington Police Corporal Elise Bowden ("Bowden").

14.    Shortly after pulling off from the traffic light, Crane was pulled over by Bowden

at the 1700 block of Spring Lake Drive, near North Fielder Road in Arlington, Texas for

allegedly throwing drug paraphernalia out of the car.  Bowden first approached the passenger

side of the vehicle where Jefferson was seated in the front seat and asked Jefferson what he

discarded from the window.  Jefferson replied that the only thing he threw from the window was

a cigarette butt.  Bowden then asked Crane what he discarded from the window.  Crane replied

that he had not thrown anything from the window. Confused as to why they were being

questioned, Crane, Jefferson and Johnson could only surmise that it was because of the vehicle

they were driving and their race.

15.    After questioning Crane and Jefferson, Bowden continued to scan the inside of

the vehicle when she noticed that Crane's daughter, Z.C., who was in the backseat, was holding a

red candy cane top. Bowden commented that what she believed to be a crack pipe was likely just

the other half of the candy container the child was holding.  Instead of apologizing for the

inconvenience of pulling Crane over, Bowden asked Crane for his driver's license.  Crane

produced his ID, explaining he did not have his license on him.  Clearly, it was Bowden's intent

to stop the vehicle because she made no attempt to personally identify what she allegedly saw thrown from the vehicle.

16.     After obtaining Crane's ID, Bowden went to her squad car and returned a short time later and asked Jefferson for his ID. Jefferson fully complied and Bowden returned to her squad car a second time.  When Bowden returned she asked Crane for a copy of his insurance policy which he produced on his phone.  After looking it over, Bowden returned to her squad car a third time.  Crane, not knowing Bowden's intent for stopping and detaining him, called the mother of his minor daughter to advise her what was taking place.  While Crane was still on the phone, Bowden returned after being away for a period of time and started another conversation with Crane.

17.     At all times during Bowden's interaction with Crane, Bowden did not attempt to forcibly remove Crane from his vehicle, nor did Crane attempt to flee, and Bowden's initial interactions with Crane was clearly dictated by her knowledge that the incident was being recorded.  Bowden's decision to stop Crane was questionable and would eventually lead to Crane's death.

18.     Bowden was joined by two other Arlington police officers and suddenly her demeanor totally changed from calm to aggression.  When the officers approached Crane's vehicle, Bowden took position at the front driver side door and Roper, one of the two officers, took position at the rear driver's side door.  The third unidentified officer took position at the passenger side front door.  Each officer shined their flashlights into the vehicle causing the passengers to become fearful of their motives.  Bowden asked Crane to step out of the car.  Crane asked why?  Crane replied he had done nothing wrong and he needed to return his daughter home.  Bowden again asked Crane to step out of the car in order to discuss the matter.

Crane, confused and terrified by the ordeal, asked Bowden for further explanation.  Suddenly, and without warning, Roper opened the driver's side back door, where Johnson was seated and immediately drew his weapon, placing the occupants of the vehicle, including a two year old girl, in danger and fear for their lives.  Roper pointed his gun at Crane and shouted "get out of the vehicle."  Roper then shouted for everyone in the vehicle to raise their hands, in which they fully complied.  Roper then entered the vehicle through the back driver side door with his gun trained on Crane's back.  Roper climbed into the car while hovering over Johnson.  Roper then placed his left arm around Crane's neck from the back position and pointed his gun at the right side of Crane around the seat.  Roper then shouted turn off the car or "I will fucking kill you!"

19.     As Tavis lowered his right hand to turn off the ignition, Roper shot Crane at close range, causing Crane's head to slope backwards. Jefferson, Johnson and Z.C., fearing they would also be shot, suffered extreme and severe mental and emotional distress, agony and anxiety. Jefferson, Johnson and Z.C. continue to deal with the psychological trauma of fearing for their lives.

20.     At no time did Crane attempt to place his vehicle in reverse to run over Bowden as reported by the APD. In fact, Crane would have not been able to see Bowden as he was restrained by Roper with a gun pointed in his side.  Roper also did not enter the vehicle to stop it from hitting Bowden as reported.  It was the actions of Roper shooting Crane and hitting the gear shift after shooting Crane that caused the vehicle to go in reverse.  The sounds of Roper shooting Crane before the vehicle was placed in reverse can clearly be he heard in a video recording of the incident   Once Roper shot Crane for no lawful reason, Crane was no longer in control of the vehicle, did not have the ability to operate the vehicle nor would he have been aware that Bowden was walking behind the vehicle. Roper caused the vehicle to roll backwards, striking

Bowden and then forward, out of control, placing the occupants of the vehicle in serious danger. As the car rolled forward, Roper shot a severely injured Crane at least one more time. The vehicle eventually crashed into an embankment causing the vehicle to come to a stop.

21.     According to Jefferson and Johnson, Crane, unarmed, was not resisting nor was he attempting to flee, run over Bowden or attack Defendant Roper or any other person when Roper shot Crane multiple times at close range. On the day Defendant Roper shot and killed Crane, the decedent was NOT committing any violent offense and in fact, Crane, Jefferson, Johnson and Z.C. posed no threat of harm to Defendant Roper or to anyone for that matter.

22.     Defendant Roper had no probable cause or reasonable suspicion to believe that Crane, Jefferson and Johnson were or attempting to commit a crime. Crane, Jefferson and Johnson did not have a gun in their hands nor were they attempting to cause bodily harm to Defendant Roper or anyone else. Crane, Jefferson and Johnson did not pose an immediate threat to the safety of Defendant Roper or others, when Defendant Roper, for no lawful reason, fatally shot Crane. As a result of Defendant Roper's deadly and unlawful attack on Crane, Crane sustained multiple injuries, which led to his painful and brutal death.

23.     Defendant, the City and APD have a longstanding record of not providing officers with adequate training, not preventing excessive force and extrajudicial killings by Arlington Police officers. The Mayor of Arlington and the Arlington City Council had in fact delegated policy-making authority to Chief Johnson, giving him the responsibility for setting training policies, knew that there were training issues. As a result of the lack of training, supervision, discipline and the official customs or policies of the APD, Arlington remains one of the top cities in the state of Texas for police misconduct. The City is ranked number three in the state of Texas in deadly police encounters. Over 70% of the officer involved shootings in the City involve black

males. The City is also ranked in the top fifty cities nationwide for officer involved shootings. There have been a number of incidents between officers and unarmed citizens that have resulted in the use of excessive and deadly force, including the highly publicize shooting death of Christian Taylor, which occurred prior to the death of Crane.

24.     Defendant Roper's inadequate training was a moving cause in the death of Crane and the injuries to Jefferson, Johnson and Z.C.  Despite the number of internal affairs complaints lodged against police officers for misconduct, the APD and the City's policymakers continue to cover-up bad acts and ratify the actions of its police officers as it now attempts to do with this case.  Defendant Roper's inadequate training resulted in the death of Crane.

25.     The internal affairs section of the APD has received hundreds of complaints involving the use of excessive force by police officers rarely taking any disciplinary action against the officers.  This has resulted in a failure to supervise, discipline, counsel, or otherwise control police officers who are known or should be known to engage in the use of excessive force.  The police officers know at the time they act that their use of excessive and/or deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of City Policymakers.  Defendant Roper is a part of "a police code of silence wherein other officers and supervisors habitually cover[ed] up the use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations.  This is exactly what has happened with the shooting death of Crane and the injuries to Jefferson, Johnson and Z.C.

26.     The problems in the APD's Internal Affairs in particular run more than policy-deep.  Internal Affairs' gut reaction to most complaints is to protect fellow officers and to disbelieve and attack the credibility of complainants.

27.     As indicated above, Defendant Roper shot Crane for no lawful reasons.  Despite the fact that Crane, Jefferson, Johnson and Z.C. did not have a weapon in their hands or on their person, Defendant Roper shot first and asked questions later, which is the custom and practice of the APD.

28.     There is no evidence that Defendant Roper or any third party were ever in any danger of imminent death or great bodily harm.  Roper shot Crane prior to Bowden being struck by the vehicle.

29.     The APD did not provide adequate training to Defendant Roper in the proper use of deadly and non-deadly force.

30.     The APD did not provide adequate training to Defendant Roper on proper arrest and confrontation techniques.

31.     The City knew or should have known that the training was inadequate or nonexistent.

32.     At the time Defendant Roper drew his gun, there had been no previous interaction between the occupants of the vehicle and Defendant Roper, and at no time did Crane, Jefferson Johnson or Z.C. do any act to justify Defendant Roper's use of deadly force.  The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect, and is to be applied under very narrowly defined circumstances.   In accordance with the Arlington Police Department's Use of Deadly Force procedures authorized by the Policymakers, "Officers will only use deadly force under the following circumstances:

a. When attempting to affect an arrest, officers should use verbal communications prior to the use of non-deadly force, if possible.

b. If verbal communication has been exhausted or proven ineffective, officers are authorized to use open/empty hands control.

c. If an open/empty hands control has been exhausted or proven ineffective; officers are authorized to use physical force.

d. If physical force has proven ineffective or is not a reasonable option based upon the circumstances, officers are authorized to use an intermediate weapon to affect an arrest.

33.     Crane, Jefferson, Johnson and Z.C. posed no risk to Defendant Roper or any other person. Crane, Jefferson, Johnson and Z.C. had not committed a crime nor were they actively resisting when Defendant Roper fired the deadly shots.

34.     Defendant Roper's unlawful and unwarranted acts, lack of training and the official customs or policies of the APD caused Crane's wrongful death and the injuries suffered by Jefferson, Johnson and Z.C.

35.     Plaintiffs would also show that at all times material hereto, Defendant Roper was acting under the color of law when he shot and killed Crane and caused the injuries to Jefferson, Johnson and Z.C.

36.     Plaintiffs would further show that Defendant Roper's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the APD in regards to the use of deadly force for which the City and the Policymakers, specifically Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton knew or should have known but never provided the requisite and proper training.

37.     Moreover, no reasonably competent official would have concluded that the actions of Defendant Roper described herein would not violate Crane, Jefferson, Johnson and Z.C.'s constitutional rights.  In other words, no reasonably prudent police officer under similar

circumstances could have believed that Defendant Roper's conduct was justified nor was the treatment of Jefferson, Johnson and Z.C., reasonable.

38.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

39.     Crane was twenty three (23) years old when he was killed by Defendant Roper. He was in good health, with a reasonable life expectancy of living at least 61 more years to age 84.  Crane was the father of five kids.

40.     During his lifetime, decedent was industrious and energetic, a good father and provider. He performed numerous and usual tasks in and about the family residence and gave advice, counsel, comfort, care, and protection to his family. In all reasonable probability, he would have continued to do so, providing for and supporting his children for the remainder of their natural lives as he planned to provide them with all the costs incident to attending college in accordance with their desires and goals in life. At his ___death___, decedent possessed assets and accumulated savings from his past earnings, which, in all reasonable probability, he would have continued to accumulate for the remainder of his natural life and left to his Children.

41.     As a result of decedent's untimely ___death___, De'On L. Crane and Alphonse Hoston has suffered pecuniary loss from the ___death___ of decedent, including loss of care, maintenance, support, services, advice, counsel, and contributions of a pecuniary value that they would, in reasonable probability, have received from decedent during decedent's lifetime had decedent lived. In addition, they have suffered loss of comfort, assistance, emotional support and love. They have suffered mental anguish, grief, and sorrow as a result of their son's ___death___ and is likely to continue to suffer for a long time in the future. For these losses, De'On L. Crane and

Alphonse Hoston seek damages in a sum in excess of the minimum jurisdictional limits of the court.

42.     G.C., T.C., G.M., Z.C. and A.C. have suffered pecuniary loss from the ***death*** of their father, including loss of care, maintenance, support, services, advice, counsel, and contributions of a pecuniary value that they would, in reasonable probability, have received from their father during his lifetime had he lived. They have suffered additional losses by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. They've suffered grief, and sorrow as a result of their father's ***death*** and are likely to continue to suffer for a long time in the future. For these losses, G.C., T.C., G.M., Z.C. and A.C. seek damages in a sum in excess of the minimum jurisdictional limits of the court.

43.     Upon information and belief, the APD have not implemented policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of gun.

## V.     CAUSES OF ACTION

**A.     Cause of Action against Craig Roper under 42 U.S.C. §1983 for Violation of the Plaintiffs' Fourth Amended Right to be free from excessive force.**

44.     Plaintiffs would show that the force used by Defendant Roper was excessive, violated Crane, Jefferson, Johnson and Z.C.'s clearly established constitutional rights, and was not objectively reasonable under the circumstances.

45.     Plaintiffs would further show that Crane was killed and Jefferson, Johnson and Z.C. were injured as a direct result of Defendant Roper's use of force that was clearly excessive and the excessiveness of which was clearly unreasonable. That is, Defendant Roper, without justification and the need to do so, used excessive and deadly force as described above and killed Crane without legal justification. Defendant Roper's use of force was clearly excessive and

clearly unreasonable because Crane, Jefferson, Johnson and Z.C. never made any threatening gestures toward Defendant Roper and did not pose an immediate threat to the safety of Defendant Roper, Bowden or others.

46.    Defendant Roper was not provoked when he fired multiple shots while inside an occupied vehicle for no lawful or justifiable reason. Crane died as a result of the gunshot wounds to his body, and as a result, Jefferson, Johnson and Z.C. feared for their lives.  The excessive and deadly force used by Defendant Roper was not reasonable or justified, nor was it necessary under the circumstances.

47.    Defendant Roper's actions were not objectively reasonable because neither Crane, Jefferson, Johnson nor Z.C. posed an immediate risk of serious physical harm to any officers or any other person.

48.    The force used by Defendant Roper was objectively unnecessary, excessive and unreasonable under the circumstances, as Crane, Jefferson, Johnson nor Z.C. did not pose an immediate threat to the safety of Defendant Roper or others and the use of such excessive and deadly force was unnecessary. Rather, Defendant Roper embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, caused Crane, Jefferson, Johnson and Z.C. to suffer extreme and severe mental and emotional distress, agony and anxiety.

49.    Further, Defendant Roper's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Defendant Roper shot and killed Crane and injured Jefferson, Johnson and Z.C.   *See, e.g., Reyes v. Bridgewater,* 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear:  an officer cannot use deadly force without an immediate serious threat to himself or others."). More

specifically, the right to be free from the use of excessive force was clearly established under the particular circumstances presented to Roper.  *See Lytle v. Bexar Cty., Tex.,* 560 F.3d 404, 417–18 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.").

50.     As a result of these Constitutional violations to Crane, Jefferson, Johnson and Z.C. and the injuries they sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**B.     Cause of Actions against the City under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment Rights.**

51.     The City is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Arlington Police Department of which the City Council, the City Manager, the Mayor, and Chief of Police all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

**1.     The City of Arlington failed to train its officers on use of force and in dealing with individuals during an entry into an occupied vehicle.**

52.     Plaintiffs incorporate by reference paragraphs 1 through 50 as if fully set forth herein.  Prior to February 1, 2017, the Policymakers, specifically Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton knew or should have known that Defendant Roper was not adequately trained.

53.     Defendant Roper was acting under the color of law and acting pursuant to customs, practices and policies of the City and the APD in regards to the use of deadly force as authorized and/or ratified by the Policymakers, specifically Mayor Williams, the City Council,

Chief Johnson and City Manager Yelverton when he deprived Crane, Jefferson, Johnson and Z.C. of rights and privileges secured to them by the Fourth Amendment to the United States Constitution and by other laws of the United States, by the City failing to provide proper training in the use of deadly in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

54.     With respect to the claims made the basis of this lawsuit, the City and the APD failed to adequately train, supervise or discipline its employees regarding the unnecessary use of deadly force.  The failure to train, supervise or discipline its employees in a relevant respect reflects a deliberate indifference to the City, APD, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

55.     Defendant the City, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton under the direction of the City Council and the City Manager developed and maintained a policy of deficient training of its police force in the use of force, including the use of deadly force in the apprehension and the wrongful detention of individuals.  The City's training is designed and implemented by Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton to act in this regard.

56.     The City, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton's failure to provide adequate training to its police officers regarding the use of deadly force and wrongful detentions reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens and made the violations of Crane, Jefferson, Johnson and Z.C.'s constitutional rights, including Crane's death, a reasonable probability.

57. Plaintiff would show that Defendant Roper's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the City, APD, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton knew or should have known but never provided the requisite and proper training.

58. On information and belief, Defendant the City, APD, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of Crane, Jefferson, Johnson and Z.C., failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to Crane, Jefferson, Johnson and Z.C. during their struggle to survive and implemented policies, procedures, and practices which actually interfered with or prevented with or prevented Crane, Jefferson, Johnson and Z.C. from receiving the protection, assistance and care they deserved.

59. For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Crane, Jefferson, Johnson and Z.C.'s constitutional rights:

(a) The inadequacy of APD'S policies, training, supervision or discipline relating to the use of deadly force;

(b) The inadequacy of APD's policies, training, supervision or discipline relating to the use of non-lethal control devices and tactics;

(c) The adoption of completely subjective continuum of force policy that can be expressly avoided and which leaves the use of deadly force exclusively to the unchecked discretion of officers on the scene;

(d) The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is deadly force;

(e) Lack of training in regard to effective communication with citizens while giving them commands and determining their compliance.

(f) Using excessive and/or deadly force against Crane, Jefferson, Johnson and Z.C. although they caused no immediate threat; and

(g) Using excessive and/or deadly force against Crane, Jefferson, Johnson and Z.C. while they were seated in a vehicle.

60.     In addition, Defendant City, as applicable, failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately on the appropriate policies, practices or procedures regarding the use of deadly force and the wrongful detention of individuals. In so doing, Defendant the City knew that it was acting against the clear dictates of current law, and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, Crane's death and Jefferson, Johnson and Z.C.'s injuries-- in all reasonable probability would occur.

61.     The City's failure to properly train, supervise and discipline its police officers regarding the use of force was the proximate cause of the violations of Crane, Jefferson, Johnson and Z.C. 's constitutional rights including the unnecessary taking of Crane's life.

**2.     The City failed to adequately supervise or discipline its officers for violent, aggressive, and excessive force and, in failing to do so, ratified and encouraged the conduct of its officers, including Defendant Roper.**

62.     Plaintiffs incorporate by reference paragraphs 1 through 61 as if fully set forth herein.

63.     On Plaintiffs' governmental liability claim against the City for failing to supervise and/or discipline its officers for prior violations and the resulting lack of supervision:

a.     The City and Chief Johnson failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

b.     The City Council and Chief Johnson were deliberately indifferent to the need to supervise and/or discipline its officers and/or employees adequately;

c. the failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Crane, Jefferson, Johnson and Z.C.'s constitutional rights; and.

d. The City and Chief Johnson failed to adequately supervise and/or discipline Defendant Roper for shooting in an occupied vehicle for no lawful reason, resulting in the death of Crane and the injuries to Jefferson, Johnson and Z.C.

64. Despite having knowledge of Defendant Roper's violation of the APD's policies and other best police practice as described above, the City, Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton failed and/or refused to adequately discipline Defendant Roper. The City's Policymakers were well aware of the out of control behavior of Defendant Roper but failed to take any actions. The City's failure to adequately supervise and/or discipline its officers was therefore the moving force behind Plaintiffs' damages.

## VI.   DAMAGES

65. **Actual damages.** Plaintiffs incorporate by reference paragraphs 1 through 64 as if fully set forth herein. Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and Defendants should be held jointly and severally liable for the following damages:

a. **Estate of Tavis M. Crane (Survival Claim).**
  1. Conscious pain and mental anguish suffered by Tavis M. Crane prior to his death;
  2. Funeral and burial expenses; and
  3. Exemplary Damages.

b. **De'On L. Crane and the statutory beneficiaries (as wrongful death beneficiaries of Tavis M. Crane).**
  1. Mental anguish—the emotional pain, torment, and suffering experienced by De'On L. Crane and the statutory beneficiaries because of the death of Tavis M. Crane.—that De'On L. Crane and the statutory beneficiaries sustained in the past and that they will, in reasonable probability, sustain in the future;
  2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that De'On L. Crane and the statutory beneficiaries would have received from Tavis M. Crane had he lived—that De'On L. Crane and the statutory beneficiaries

sustained in the past and that they will, in reasonable probability, sustain in the future;

      3.      Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that De'On L. Crane and the statutory beneficiaries would have received from Tavis M. Crane had he lived—that De'On L. Crane and the statutory beneficiaries sustained in the past and that they will, in reasonable probability will sustain in the future.

**c.**      **Alphonse Hoston (as wrongful death beneficiaries of Tavis M. Crane).**

      1.      Mental anguish—the emotional pain, torment, and suffering experienced by Alphonse Hoston because of the death of Tavis M. Crane.—that Alphonse Hoston sustained in the past and that he will, in reasonable probability, sustain in the future;

      2.      Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Alphonse Hoston would have received from Tavis M. Crane had he lived—that Alphonse Hoston sustained in the past and that he will, in reasonable probability, sustain in the future;

      3.      Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Alphonse Hoston would have received from Tavis M. Crane had he lived—that Alphonse Hoston sustained in the past and that he will, in reasonable probability will sustain in the future.

**d.**      **Dwight Jefferson (excessive force).**

      1.      Jefferson was in the vehicle and within Defendant Roper's line of fire when Roper fatally shot Crane.  Jefferson was traumatized and in shock and has suffered direct personal injury in the form of mental anguish and severe emotional distress.

      2.      Mental anguish and emotional distress sustained as a result of Defendant Roper's excessive force.

**e.**      **Valencia S. Johnson (excessive force).**

      1.      Johnson was in the vehicle and within Defendant Roper's line of fire when Roper fatally shot Crane.  Johnson was traumatized and in shock and has suffered direct personal injury in the form of mental anguish and severe emotional distress.

      2.      Mental anguish and emotional distress sustained as a result of Defendant Roper's excessive force.

**f.**      **Z.C. (excessive force).**

      1.      Z.C. was in the vehicle and within Defendant Roper's line of fire when Roper fatally shot Crane.  Z.C. was traumatized and in shock and has suffered direct personal injury in the form of mental anguish and severe emotional distress.

2.    Mental anguish and emotional distress sustained as a result of Defendant Roper's excessive force.

66.    **Punitive/Exemplary Damages against Defendant Roper.**  Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of Defendant Roper was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of the Plaintiffs.  As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

67.    Prejudgment and post judgment interest.

68.    Costs of court.

69.    Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

70.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VII.    CONDITIONS PRECEDENT

71.    Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiffs' recovery have been performed or have occurred.

## VIII.    TRIAL BY JURY

72.    Plaintiffs have paid a jury fee and demands trial by jury.

## IX.   <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.


Respectfully submitted,


By:  /s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714
**WASHINGTON LAW FIRM, P.C.**
325 N. St. Paul St., Suite 3950
Dallas, Texas  75201
214 880-4883
214-751-6685 - fax

**ATTORNEYS FOR PLAINTIFFS**