## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **DE'ON L. CRANE et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:19-cv-00091-P** |
| | § | |
| **CITY OF ARLINGTON et al.,** | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Craig Roper's Second Motion and Brief to Dismiss ("Roper's Motion to Dismiss"). *See* ECF No. 35. Also before the Court is City of Arlington's ("Arlington") Second Motion to Dismiss Under Rule 12(b)(6) and Brief in Response to Plaintiffs' Second Amended Original Complaint ("Arlington's Second Motion to Dismiss"). *See* ECF No. 37. Having considered Roper's Motion to Dismiss, briefing, and applicable law, the Court finds that Roper's Motion to Dismiss should be and hereby is **GRANTED in part and DENIED in part.** Having considered Arlington's Motion to Dismiss, briefing, and applicable law, the Court finds that the Motion to Dismiss should be and hereby is **GRANTED in part and DENIED in part.**

### BACKGROUND

The Court draws its factual account from the allegations in Plaintiffs' Second Amended Original Complaint ("Complaint"). *Manguno v. Prudential Prop. & Case. Ins. Co.*, 276 F.3d 720, 725 (5th Cir. 2002) (noting that when considering a Rule 12(b)(6)

motion to dismiss "all facts pleaded in the complaint must be taken as true").  This factual account can be found in Plaintiffs' Second Amended Complaint at pages 5–14 (ECF No. 30).

## A.    The Incident

On or about the evening of February 1, 2017, Tavis Crane was driving his car in Arlington, Texas, with Dwight Jefferson, Valencia Johnson, and his two-year-old daughter, Z.C. Jefferson was seated in the front passenger side seat, Johnson was seated in the rear driver's side seat, and Z.C. was seated in the passenger side rear seat. While stopped at a traffic light, Z.C. dropped a candy cane package out of the passenger side window. Plaintiffs allege that at no time prior to that time had Crane violated any provisions of the Texas Transportation Code that would justify a legal traffic stop by Arlington Police Corporal Elise Bowden.

Shortly after going through the intersection, Crane was pulled over by Bowden at the 1700 block of Spring Lake Drive, near North Fielder Road in Arlington, Texas. Bowden first approached the passenger side of the vehicle, where Jefferson was seated in the front seat, and asked Jefferson what he discarded from the window. Jefferson replied that the only thing he threw from the window was a cigarette butt. Bowden then asked Crane what he discarded from the window. Crane replied that he had not thrown anything from the window.

After questioning Crane and Jefferson, Bowden continued to scan the inside of the vehicle when she noticed that Z.C. was holding a red candy cane top. Bowden commented she believed a crack pipe had been thrown out of the window, but it was likely just the

2

other half of the candy container. Bowden then asked Crane for his driver's license. Crane produced his state-issued identification card and explained that he did not have his driver's license with him. Because Bowden did not attempt to retrieve and identify what she saw thrown from the vehicle, Plaintiffs imply that there were other reasons for stopping the vehicle.

Bowden made several trips back and forth to her squad car with Crane's and Jefferson's I.D. cards and insurance information before returning and spoke with Crane. At no point during Bowden's interaction with Crane did she attempt to remove Crane from his vehicle, nor did Crane attempt to flee.

Bowden was then joined by two other Arlington Police Department ("APD") police officers, and Plaintiffs allege that her demeanor and attitude suddenly changed from calm to aggressive. When the other officers approached Crane's vehicle, Bowden stood at the front driver side door and Officer Roper stood at the rear driver's side door. The third officer, who Plaintiffs did not identify, stood at the passenger side front door. Each officer shined their flashlight into the vehicle, causing the passengers to become fearful. Bowden asked Crane to step out of the car. Crane asked for the reason, claiming that he had done nothing wrong and expressed his need to return his daughter home. Bowden again asked Crane to step out of the car to discuss the matter. Crane, now confused and scared, again asked Bowden for an explanation. Suddenly, and without warning, Roper opened the driver's side back door, where Johnson was seated, drew his weapon, and pointed it in the car. Roper then pointed his gun at Crane, shouted for him to get out of the vehicle, and instructed everyone in the vehicle to raise their hands. Each passenger complied with the

3

order to raise their hands, but Crane did not exit the vehicle. Roper then entered the vehicle through the rear driver side door, climbing over Johnson with his gun facing her. Roper then placed his left arm around Crane's neck from the back position and pointed his gun at Crane's right side. Roper then shouted at Crane to turn off the car or he would kill him. At all times, Crane's hands were fully visible to Roper and it was clear that Crane was unarmed.

Crane then lowered his right hand to turn off the ignition, as instructed by Roper, Roper shot Crane at close range, causing Crane's head to fall backward. At no times did Crane have a gun in his hand or on his person, nor did he make any threatening gestures. Jefferson, Johnson, and Z.C., fearing they would also be shot by Roper, suffered extreme and severe mental and emotional distress, agony, and anxiety. Jefferson, Johnson, and Z.C. continue to experience psychological trauma as a result of the shooting.

Although Plaintiffs fail to specifically describe what happened after Roper shot Crane, the Court deduces that the car ended up in reverse and struck Bowden before moving forward again in an out-of-control manner. Plaintiffs claim that Crane did not intentionally place his vehicle in reverse to run over Bowden as reported by the APD. In fact, Plaintiffs claim Crane could not have seen Bowden because he was restrained by Roper with a gun pointed in his side. Plaintiffs allege Roper also did not enter the vehicle to stop it from hitting Bowden as reported. According to Plaintiffs, it was the actions of Roper shooting the unarmed Crane and subsequently hitting the gear shift with his body that caused the vehicle to be shifted into reverse. Crane was no longer in control of the vehicle, could not operate the vehicle, nor could he have known that Bowden was walking behind the vehicle.

4

Roper caused the vehicle to roll backward striking Bowden, and then forward, out of control, placing the occupants of the vehicle in serious danger. As the car rolled forward, Roper shot a severely injured Crane at least one more time. The vehicle eventually crashed into an embankment causing the vehicle to come to a stop. Roper's acts placed the occupants of the vehicle in serious jeopardy as they could have additionally been seriously injured or killed when the vehicle crashed into the embankment.

Roper had no probable cause or reasonable suspicion to believe that Crane, Jefferson, Johnson, or Z.C. were attempting to commit a crime, that they had a gun in their hands, or that they were attempting to cause bodily harm to Roper or anyone else. Crane, Jefferson, Johnson, and Z.C. did not pose an immediate threat to the safety of Roper or others when Roper shot Crane. As a result of Roper's attack, Crane sustained multiple injuries, which led to his death.

## B.    The Parties

De'On Crane brought this Fourth Amendment excessive force action on behalf of and as administrator of Tavis Crane's estate, as well as on behalf of Tavis Crane's statutory beneficiaries G.C., T.C., G.M., Z.C., A.C., C.C., T.J., and T.C., Jr., the surviving children of Tavis Crane. Alphonse Hoston is also included as a plaintiff because he is Tavis Crane's father and a "wrongful death beneficiary." Finally, Dwight Jefferson, Valencia Johnson, and Z.C. each have their own Fourth Amendment claims that they bring alongside Tavis Crane's estate/beneficiaries. This suit is brought against Arlington police officer Craig Roper and the City of Arlington, Texas under *Monell*.

C.      *Monell* **Facts**

Plaintiffs claim that the Mayor of Arlington, the Arlington City Council, and Chief of Police Johnson are the parties responsible for APD policies and were aware of a variety of training issues. Specifically, Plaintiffs contend that Arlington and APD have a longstanding record of not providing officers with adequate training in de-escalation techniques, not preventing excessive force and adopting a custom of utilizing excessive— and frequently deadly—force to resolve normal police encounters. Plaintiffs also make the following statistical assertions:

- As a result of the lack of training, supervision, discipline and the official customs or policies of the APD, Arlington remains one of the top cities in the state of Texas for police misconduct;

- Arlington is ranked number three in the state of Texas for deadly police encounters;

- Over 70% of the officer-involved shootings in Arlington involve black males; and

- Arlington is ranked in the top fifty cities nationwide for officer-involved shootings.

Plaintiffs describe the March 2015 death of Jonathan Paul, the August 2015 death of Christian Taylor, the July 2017 death of Gabriel Olivas, and the August 2019 death of Maggie Brooks, all involving APD officers. These examples are used to illustrate multiple instances where APD officers have used force that resulted in death.

6

According to Plaintiffs, the internal affairs section of the APD has received hundreds of complaints involving the use of excessive force by police officers and rarely takes any disciplinary action against officers. Despite the number of internal affairs complaints lodged against police officers for misconduct, Arlington's policymakers allegedly cover-up bad acts and thereby constructively ratify the actions of its police officers. The result is a failure to supervise, discipline, counsel, or otherwise control police officers who are known or should be known to engage in the use of excessive force. The police officers know that they will likely receive protection from APD policymakers should they use excessive and/or deadly force in conscious disregard of the rights and safety of innocent third parties. Plaintiffs assert that Roper is a part of a described "police code of silence wherein other officers and supervisors habitually cover[ed] up the use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations."

Plaintiffs allege that APD did not provide adequate training to Roper in the proper use of deadly and non-deadly force, on proper arrest and confrontation and de-escalation techniques, and that Arlington and APD knew or should have known that the training provided to police officers was inadequate or nonexistent.

According to Arlington Police Department's Use of Deadly Force procedures, "Officers will only use deadly force under the following circumstances:

a. When attempting to affect an arrest, officers should use verbal communications prior to the use of non-deadly force, if possible.

7

b. If verbal communication has been exhausted or proven ineffective, officers are authorized to use open/empty hands control.

c. If an open/empty hands control has been exhausted or proven ineffective; officers are authorized to use physical force.

d. If physical force has proven ineffective or is not a reasonable option based upon the circumstances, officers are authorized to use an intermediate weapon to affect an arrest."

Plaintiffs allege that Roper's unlawful and unwarranted acts, lack of training and the official customs or policies of the APD caused Crane's wrongful death and the injuries suffered by Jefferson, Johnson and Z.C. Plaintiffs allege that at all times during the incident, Roper was acting under the color of law when he shot and killed Crane.

Plaintiffs would further show that Roper's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the APD in regards to the use of deadly force for which the City and the Policymakers, specifically Mayor Williams, the City Council, Chief Johnson and City Manager Yelverton knew or should have known but never provided the requisite and proper training. Plaintiff also alleges that they are unaware of any efforts by APD to implement policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of gun. Plaintiff states that it was Roper's inadequate training in proper arrests and de-escalation techniques combined with the alleged unspoken approval from policymakers resulted in the death of Crane.

## LEGAL STANDARDS

### A.     Motion to Dismiss

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier*

*v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).  The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Iqbal*, 556 U.S. at 678–79.  When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief.  *Id.*

### B.     Qualified Immunity

"Because qualified immunity is an immunity from suit rather than a mere defense to liability," it is important to resolve "immunity questions at the earliest possible stage in litigation" so that the immunity is not effectively lost.  *Pearson v. Callahan*, 555 U.S. 223, 231–32, 129 S. Ct. 808 (2009) (internal citations and quotation marks omitted); *see also Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) ("[A]s the Supreme Court has noted, that is precisely the point of qualified immunity: to protect public officials from expensive, intrusive discovery until and unless the requisite showing overcoming immunity is made.").  Thus, "questions regarding qualified immunity are resolved on the face of the pleadings and with limited resort to pre-trial discovery."  *James ex rel. James v. Sadler*, 909 F.2d 834, 838 (5th Cir. 1990).  Courts require that § 1983 plaintiffs satisfy specific pleading requirements in cases, such as this, in which an immunity defense can be raised. *Jackson v. City of Beaumont Police Dep't*, 958 F.2d 616, 620 (5th Cir. 1992).  Qualified immunity is available to public officials such as prison guards and state hospital employees, who exercise discretion.  *See, e.g.*, *Wood v. Strickland*, 420 U.S. 308, 318 (1975) ("[I]n varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and

10

responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.  It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 247–48 (1974))).

When a public official asserts qualified immunity, the Court must proceed to a two-step analysis.  *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003).  "First, we must determine whether the plaintiff has made a sufficient showing that the official violated a clearly established constitutional or statutory right."  *Id.*  "A right is clearly established when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  If the plaintiff satisfies step one, the Court asks whether the official's actions were objectively reasonable in light of the clearly established right. *Foley*, 355 F.3d at 337. "We consider an official's conduct to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution."  *Gates*, 537 F.3d at 419.  At the motion to dismiss stage of a proceeding, the alleged conduct of the defendant is what "is scrutinized for objective legal reasonableness."  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).  Although courts normally handle the two steps sequentially, district courts retain "discretion in deciding which of the two prongs of the qualified immunity analysis

11

should be addressed first in light of the circumstances in the particular case at hand."
*Pearson*, 555 U.S. at 236.

## ANALYSIS OF ROPER'S MOTION TO DISMISS

Plaintiffs assert a Fourth Amendment excessive force claim against Roper. *See* Am.
Compl. at 14, ECF No. 30. Roper seeks to invoke the qualified immunity doctrine by
moving for dismissal of this claim for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6).  Roper MTD at 3, ECF No. 35.  Roper further argues that Jefferson,
Johnson, and Z.C.'s claims should be dismissed because they were bystanders and
bystanders do not have a cause of action for police conduct not directed at them under §
1983. The Court finds that the Plaintiffs suing on behalf of Crane and his estate have
sufficiently pled facts to overcome Roper's claim of qualified immunity at the 12(b)(6)
stage of this proceeding, but that Jefferson, Crane, and Z.C.'s excessive force claims fail
because they have failed to plead facts that demonstrate that they were more than just
bystanders in the alleged incident.

**A.     Roper's Motion to Dismiss is Denied as to Crane's Estate, Statutory
        Beneficiaries, and Hoston.**

To state a § 1983 excessive force claim under the Fourth Amendment, a plaintiff
must first show that he was seized and that he suffered (1) an injury that (2) resulted directly
and only from the use of force that was excessive to the need and that (3) the force used
was objectively unreasonable.  *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir.
2004); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).  To "gaug[e]
the objective reasonableness of the force used by a law enforcement officer, we must

12

balance the amount of force used against the need for force." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996) (citing *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir. 1993)).  This balancing test "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.

"Unlike some areas of constitutional law, the question of when deadly force is appropriate—and the concomitant conclusion that deadly force is or is not excessive—is well-established." *Reyes v. Bridgwater*, 362 F. App'x 403, 406 (5th Cir. 2010) (citing *Tennessee v. Garner,* 471 U.S. 1, 11–12 (1985) for the "holding that deadly force is not justified unless a suspect poses a risk of serious harm at that point in time").  Under Fifth Circuit precedent, the focus of the Court's inquiry is "the act that led [the officer] to discharge his weapon." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009).  "The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others." *Reyes*, 362 F. App'x at 409.

Plaintiffs allege in the Second Amended Complaint that Roper drew his gun when he arrived at the traffic stop and that he pointed the gun at Crane's side while in the seat behind Crane.  Sec. Am. Compl. at 7, ECF No. 30.  Plaintiffs allege that Roper was behind Crane in the car and that Crane never attempted to resist or turn toward Roper. *Id.*  Plaintiffs further allege that Crane was shot while attempting to turn the vehicle off, as instructed by Roper and that at no point did Crane ever have a gun or other weapon in his possession during the alleged incident. *Id.* Roper deliberately fired multiple shots into Crane's side, causing Crane's head to "slope backward," and ultimately leading to his death. *Id.*

Roper argues that the allegations in Plaintiffs' prior Second Amended Complaint deliberately omit, or "cherry-pick", material facts that fail to explain the totality of the circumstances and are insufficient to overcome either prong of qualified immunity. Roper MTD Reply at 5, ECF No. 44. Roper may be correct that Plaintiffs are cherry-picking facts to create a narrative that Roper shot an unarmed man from behind while the man had his hands up. But at this stage, the Court does not go beyond the allegations of Plaintiffs' Second Amended Complaint to make such factual determinations. *See Arreola v. City of Fort Worth*, 2020 WL 3404120, No. 4:17-cv-00629-P (N.D. Tex. June 19, 2020). Based on Plaintiffs' specific allegations, Roper shot Crane from behind while Crane had his hands up and was trying to comply with Roper's order, thus was not posing a serious, immediate threat to himself or others.  These allegations, taken as true for purposes of this motion, demonstrate that Roper's use of deadly force was objectively unreasonable.  Thus, the Court finds that Plaintiffs have stated a claim that Roper violated Crane's clearly established right to be free from the excessive use of force.  *See Webster v. City of Houston*, 735 F.2d 838, 845 (5th Cir. 1984) (en banc), *aff'd on reh'g*, 739 F.2d 993 (5th Cir. 1984) (en banc); *Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908, at *7 (W.D. Tex. Nov. 15, 2006) (denying motion to dismiss excessive force claim against an individual officer because "[i]f these facts are true, [the officer's] actions may have violated the standard for reasonable seizures under the Fourth Amendment, that a police officer may not seize an unarmed, non-dangerous suspect by shooting him dead"); *see also Reyes*, 362 F. App'x at 409 (reversing summary judgment in favor of officer on qualified immunity

14

when the facts were disputed as to whether there was an immediate threat such that would justify the officer's use of deadly force).

Accordingly, Roper's Motion to Dismiss Plaintiffs' excessive force claim should be and hereby is **DENIED** as to Crane's estate, statutory beneficiaries, and Alphonse Hoston.

## B.     Roper's Motion to Dismiss is Granted as to Jefferson, Johnson, and Z.C.

Case law holds that a bystander who witnesses a police action, but who is not himself or herself an object of that action, cannot recover for resulting emotional injuries under § 1983, although there may be such a claim under state tort law—there is no constitutional right to be free from witnessing police action, apart from the question of whether that action physically injured the target of that action. *See Archuleta v. McShan*, 897 F.2d 495, 496–500 (10th Cir. 1990); *Grandstaff v. Borger*, 767 F.2d 161, 172 (5th Cir. 1985); *Young v. Green*, 2012 WL 3527040, No. H-11-1592, *4 (S.D. Tex. Aug. 15, 2012). "Negligent infliction of emotional distress is a state common law tort; there is no constitutional right to be free from witnessing this police action. 'Section 1983 imposes liability for violation of rights protected by the Constitution, not for violations of duties of care arising out of tort law.'" *Grandstaff*, 767 F.2d at 172 (citing *Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

The Court finds that Plaintiffs Jefferson, Johnson, or Z.C. have not sufficiently pled facts that establish that they were the objects of Roper's actions or that Roper's actions physically injured them. These plaintiffs claim that Roper, by pointing a gun in the car, yelling at them to put their hands up, and shooting Crane in front of them, has caused each of them to experience severe and extreme emotional distress, agony, and anxiety. *See* Sec.

Am. Compl. at 15, ECF No. 30. They argue that *Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998), is similar and should apply because the officer in *Petta* was also yelling and forcing his way into the vehicle. Roper MTD Resp. at 14–15, ECF No. 42. But the officer in *Petta* also broke the windows of the vehicle, shot at the moving vehicle, and acted in such a way that not only did the mother experience the excessive force, but her children did as well. *See Petta*, 143 F3d. at 898–99. While the passengers of the vehicle in the instant case were surely frightened, *Petta* is factually distinguishable because Roper's conduct did not rise to the level of breaking glass or firing bullets at a moving car, both of which expose the passengers to far greater risk than what occurred.

Because Plaintiffs failed to plead facts showing that Jefferson, Johnson, or Z.C. were the object of Roper's conduct or physically harmed by that conduct, the Court finds that they are bystanders of this incident and therefore do not have a § 1983 claim. Accordingly, Roper's Motion to Dismiss is **GRANTED** as to Jefferson, Johnson, and Z.C. and those Plaintiffs' claims against him are **DISMISSED with prejudice.**

### ANALYSIS OF ARLINGTON'S MOTION TO DISMISS

Plaintiffs also allege a *Monell* claim against Arlington under Section 1983. Sec. Am. Compl. at 16, ECF No. 30. Arlington's Second Motion to Dismiss seeks dismissal on 12(b)(6) grounds. *See* Arlington's Sec. MTD, ECF No. 37. Because Plaintiffs have sufficiently pled facts that would establish a custom or policy of ratifying the use of excessive force, the Court finds that Arlington's Second Motion to Dismiss should be and hereby is **DENIED** as to Crane's estate, statutory beneficiaries, and Alphonso Hoston. But because the Court finds that Jefferson, Johnson, and Z.C. were bystanders in this incident

16

and there are no bystander claims under § 1983, Arlington's Second Motion to Dismiss is **GRANTED** as to Jefferson, Johnson, and Z.C.

A person who believes his or her constitutional rights were violated during pretrial detention may sue any "person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia" subjected them to the deprivation under 42 U.S.C. § 1983. The Supreme Court has held that Congress intended for "municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018 (1978). This means that municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* Additionally, municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* But the municipality cannot be held liable solely because it employed a tortfeasor. *Id.* Rather, it is only liable "when execution of government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

Plaintiffs allege that the following Arlington policies, customs, and/or practices caused Crane's death and injury to Jefferson, Johnson, and Z.C.:

a.  The City of Arlington failed to train its officers on use of force, de-escalation techniques and in dealing with individuals during an entry into an occupied vehicle; and

b.  The City failed to adequately supervise or discipline its officers for violent, aggressive, and excessive force and, in doing so, ratified and encouraged the conduct of its officers, including Roper.

Sec. Am. Compl. at 17–20, ECF No. 30.

To state a *Monell* claim against Arlington, Plaintiffs are "required to plead facts that plausibly establish: 'a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.'" *Ratliff v. Aransas Cty.*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)).

Plaintiffs satisfy the policymaker prong by alleging that the alleged policies were known, approved, encouraged, and ratified by Arlington officials, specifically Arlington Mayor Williams, Arlington City Council, Arlington City Manager Yelverton, and Chief of Police Johnson, who are the alleged policymakers for Arlington Police Department. Sec. Am. Compl. at ¶ 23. This pleading goes beyond what the Fifth Circuit has held to be insufficient—inviting "no more than speculation that *any* particular policymaker, be it the chief of police or the city commission, knew about the alleged custom." *Peña v. Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (emphasis added). Accordingly, Plaintiffs' have satisfied the policymaker prong of their *Monell* claim.

The Court holds that Plaintiffs have pled facts that would establish an official custom or policy to support their alleged constitutional violations because they allege facts demonstrating a persistent, widespread practice of excessive force used by officers

18

followed by constructive ratification and approval by policymakers. Because Plaintiffs allege the absence of policies, they were required to allege facts of a persistent, widespread practice such that the Court could rationally infer it represented a custom having the force of an official Arlington policy. *Compare Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995) *with Ratliff*, 948 F.3d at 285. In *Ratliff*, the Fifth Circuit considered the plaintiff's custom or policy allegation that "the assault, beating, and severe injury to citizens, with little or no justification, is a persistent, widespread practice of [Aransas] County employees namely officers/deputies—that, although not authorized by officially adopted policy, is so common and well settled as to constitute a custom that fairly represents official county policy." *Id.* The Fifth Circuit concluded that this allegation did not satisfy federal pleading standards because it did "not contain any specific facts. Instead, the complaint's only specific facts appear in the section laying out the events that gave rise to this action. Thus, Ratliff's complaint clearly does not satisfy *Twombly* or *Iqbal* with respect to the allegation that excessive force is an Aransas County 'custom.'" *Id.* Here, Plaintiffs not only described the incident at issue, but they also account for four other specific instances where Arlington officers' conduct resulted in the death of a citizen. *See* Sec. Am. Compl. at 9–10. Plaintiffs did more than describe only the incident that gave rise to this injury, avoiding the deficiency present in *Ratliff*. *See id.*

Further, when a *Monell* claim is based on a policy of inadequate training, the plaintiff must allege deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (holding claims "alleging that the city's failure to provide training to municipal employees resulted in the

19

constitutional deprivation [the plaintiff] suffered—are cognizable under § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants"). All of Plaintiffs' allegations are for deficient policies. Thus, Plaintiffs were required to plead facts supporting that Arlington was deliberately indifferent.

Plaintiffs allege that the identified policymakers were actually aware of systemic deficiencies in officer training given the high number of complaints received, and that they constructively ratified and approved of the conduct by covering up and failing to discipline officers against whom complaints were filed. *See* Sec. Am. Compl. 10–11. Thus, Plaintiffs have sufficiently pled facts, which if taken as true, satisfy the custom or policy prong of the *Monell* analysis.

Finally, Plaintiff satisfies the final prong of *Monell* by alleging that is the persistent acceptance, approval, and covering up of bad acts that led Roper to shooting Crane—in effect, the "moving force" behind the action. Sec. Am. Compl. at ¶ 34; *Ratliff*, 948 F.3d at 285.

Accordingly, Arlington's Second Motion to Dismiss Plaintiffs' *Monell* claims should be and is hereby is **DENIED** as to Crane's estate, statutory beneficiaries, and Hoston.

For the reasons stated above, the Court finds that Jefferson, Johnson, and Z.C. were bystanders and, therefore, Arlington's Second Motion to Dismiss is **GRANTED** as to Jefferson, Johnson, and Z.C. Accordingly, Jefferson, Johnson, and Z.C.'s claims against Arlington are hereby **DISMISSED with prejudice.**

20

## CONCLUSION

For the foregoing reasons, the Court finds that Roper's Motion to Dismiss (ECF No. 35), should be and is hereby **GRANTED in part and DENIED in part.** Accordingly, Jefferson, Johnson and Z.C.'s claims are **DISMISSED with prejudice.**

The Court finds that Arlington's Second Motion to Dismiss (ECF No. 37) should be and hereby is **GRANTED in part and DENIED in part.** Accordingly, Jefferson, Johnson, and Z.C.'s claims are **DISMISSED with prejudice.**

**SO ORDERED** on this **16th day** of **July, 2020.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE